Filed 2/22/16  P. v. Harper CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B257355 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA055372) |
| v. | |
| NICHOLAS BRIAN HARPER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed with directions.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Timothy M. Weiner, Deputy Attorney General, for Plaintiff and Respondent.

# I.  INTRODUCTION

A jury convicted defendant, Nicholas Brian Harper, of voluntary manslaughter. (Pen. Code, § 192, subd. (a).)[1]  The jury found defendant personally used a shotgun in the commission of the offense.  (§ 12022.5, subd. (a).)  Defendant was sentenced to 21 years in state prison.  We affirm the judgment.  But we direct that defendant's abstract of judgment be amended.

# II.  THE EVIDENCE

## A.  The Shooting

On February 7, 2012, defendant shot and killed James McElroy.  Defendant and Mr. McElroy were close friends and roommates.  Defendant tossed his weapon, a .410-guage shotgun, off of their apartment's balcony into the bushes below.  Defendant tossed a gun belonging to Mr. McElroy into the bushes as well.  Initially, defendant lied to the police and others.  He repeatedly said "two male Blacks" shot Mr. McElroy.  Defendant subsequently confessed to shooting Mr. McElroy, but claimed it was an accident. Defendant said they were trying to force his loaded shotgun closed when it fired. Defendant said the shotgun was "pretty close" to the victim's face when it discharged, maybe five to six inches away.

Mr. McElroy's girlfriend, Carla Barajas, was sleeping in a bedroom when she heard the gunshot.  When Ms. Barajas entered the living room, Mr. McElroy was sitting on the couch with blood gushing out of his mouth.  Defendant was standing in front of Mr. McElroy.  Defendant held his cellular telephone in his hand.  Defendant was talking to someone.  He was telling them to send an ambulance.  A recording of a telephone call

---

[1]  Further statutory references are to the Penal Code unless otherwise noted.

to an emergency operator was introduced at trial. On the tape defendant can be heard saying, "I'm so fucking sorry dude," and "James I'm so sorry."

Ms. Barajas ran into the bathroom and locked the door. She called Mr. McElroy's mother, Clemmie J. Graves. Defendant "busted" into the bathroom. (Subsequent investigation showed the bathroom door latching mechanism had been damaged and the door had been forced inward.) Defendant grabbed Ms. Barajas by the shoulders with both hands. Defendant told Ms. Barajas, "Two Black guys did it." Ms. Barajas described defendant's demeanor as unemotional, nervous, aggressive and very focused. Ms. Barajas said defendant was trying to be convincing.

Ms. Graves entered the apartment with her daughter, Shante McElroy. Defendant was standing near Mr. McElroy. Mr. McElroy was fighting defendant off with both hands. Defendant told Ms. Graves that "two Black guys" had shot her son. Ms. Graves asked defendant to help her lift Mr. McElroy off the couch. But when defendant got close, Mr. McElroy pushed defendant away with all his strength. Defendant approached Ms. McElroy. Mr. McElroy grabbed Ms. McElroy's wrist and "yanked" her away from defendant. At trial, Ms. McElroy described defendant's demeanor. Ms. McElroy testified defendant's face showed "no emotion."

Deputy Michael Rose questioned defendant at the scene. Defendant said, "Two male Blacks" were responsible. Deputy Rose asked defendant to describe how the men shot Mr. McElroy. Defendant said, "I pulled out the gun." Defendant stopped and shook his head. Then defendant said, "He pulled out the gun . . . ."

Deputy Gustavo Munoz also interviewed defendant at the scene. Defendant told Deputy Munoz that "two male Blacks" shot Mr. McElroy. Defendant said the two men had approached him in the apartment complex parking lot. They wanted to buy marijuana. Defendant told the men to meet him at the apartment. When the two men walked into the living room, one pulled out a rifle and shot Mr. McElroy. The two men fled on foot in an unknown direction.

## B. The Ballistics and Firearms Evidence

Mr. McElroy died of a gunshot wound to the face. A medical examiner, Dr. Raffi Djabourian, testified the entrance wound was inside Mr. McElroy's mouth. The entrance wound was outside Mr. McElroy's teeth. Dr. Djabourian said the gun's barrel was against Mr. McElroy's teeth when the fatal shot was fired. Dr. Djabourian based his conclusion on the nature of the injuries and the soot pattern left by the discharge.

Individuals with expertise in firearms and ballistics testified for both the prosecution and the defense. The witnesses disagreed about a crucial fact—whether the shotgun could have gone off accidentally as defendant had described. Manual Munoz testified for the prosecution. Mr. Munoz had test-fired defendant's shotgun. He observed varying soot and spread patterns depending on the distance from the target. Mr. Munoz concluded the weapon could not have accidentally discharged as defendant claimed because properly functioning safety mechanisms would have prevented it.

Dr. Bruce Krell testified for the defense. Dr. Krell had also test-fired the shotgun. Dr. Krell concluded the weapon was about 16 inches from Mr. McElroy's face when it was fired. Further, Mr. McElroy's wound was "consistent with an attempt to force the loaded barrel closed," in Dr. Krell's opinion. Dr. Krell testified the weapon could have been accidentally "slam fire[d]" as defendant claimed. Dr. Krell's videotaped demonstration of such an accidental discharge was shown to the jury. On cross-examination, Dr. Krell acknowledged the ammunition he had used was not the same type as that recovered from the crime scene. In rebuttal, Mr. Munoz testified Dr. Krell could not have "slam fire[d]" the weapon as demonstrated absent a defect in the weapon. Mr. Munoz further testified no such defect existed.

4

## C. Defendant's Prior Statements About Shooting Mr. McElroy

Mr. McElroy was 6 feet, 3 inches tall and weighed 260 pounds. Mr. McElroy was bigger and taller than defendant. Prior to the shooting, several witnesses had heard defendant threaten to shoot rather than fight Mr. McElroy. Ms. McElroy testified that one month prior to the shooting, defendant tried to pick a fight with Mr. McElroy. Mr. McElroy told defendant to, "Knock it off." Defendant responded: "Well, I wouldn't fight you anyway. If I were ever to fight you, I would shoot you or stab you." Mr. McElroy's aunt, Sonia Tran, one to three months prior to the shooting, heard defendant tell Mr. McElroy, "[T]hat if he ever had to fight him, that he would just shoot him." Defendant's exact words were, "I wouldn't waste my time. I would just shoot you." On the Saturday before Mr. McElroy's death, defendant told Ms. Tran: "If he had to fight James, that he wouldn't [waste] his time. [He would] just shoot him." A friend, Austin Montemayor, similarly testified that on two or three occasions defendant said to Mr. McElroy: "[Y]ou're too big. [If] I want to get down with you[,] I'll shoot you." There was also evidence defendant made a similar statement to his girlfriend, Lucia Pacheco. On January 10, 2012, a month prior to the shooting, defendant sent a text message to Ms. Pacheco stating, "Don't talk back to me or I'll shoot you in the face."

## D. Mr. McElroy's Fear of Defendant

The prosecution presented evidence Mr. McElroy feared defendant. Mr. McElroy spoke to Ms. Tran. Mr. McElroy was concerned about defendant having a firearm in the apartment. Mr. McElroy wanted to confront defendant about removing the shotgun from the home. According to Ms. Tran, Mr. McElroy was scared and felt threatened and he was concerned something bad might happen. Mr. McElroy was friends with Brandon Alvarado. Mr. Alvarado testified that tension had been building between defendant and Mr. McElroy in the weeks preceding the shooting. Approximately one week prior to the shooting, Mr. McElroy spoke to Mr. Alvarado. Mr. McElroy was concerned about

defendant having access to a firearm. Mr. Alvarado described Mr. McElroy's fear thusly, "That he thought that [defendant] was gonna do him dirty."

## E. Defendant's Motive

The prosecution presented evidence of two possible motives for the shooting. One was that defendant and Mr. McElroy were arguing over the rent. Defendant had been served with a notice to pay or quit. And, earlier in the evening, prior to the shooting, Ms. Barajas heard defendant and Mr. McElroy argue about the rent. The rent was due the following day. The other possible motive was Mr. McElroy's relationship with defendant's girlfriend, Ms. Pacheco. As noted above, Mr. Alvarado testified Mr. McElroy had a romantic relationship with Ms. Pacheco. Mr. Alvarado had seen Mr. McElroy and Ms. Pacheco "holding hands and kissing" on more than one occasion. Mr. Alvarado did not know whether defendant was aware of the relationship. But two weeks prior to Mr. McElroy's death, Mr. Alvarado saw a text message from defendant to Mr. McElroy. The message said something like: "You're my best friend, my brother. You stabbed me in my back. How could you do this to me?" And, according to Mr. Alvarado, on the day of the shooting, defendant and Mr. McElroy "looked like they weren't talking to each other" and "weren't getting along." Another friend, Jonathan Isai Olguin SiFuentes, testified Mr. McElroy seemed "troubled" on the day of the shooting. But Mr. SiFuentes did not hear defendant and Mr. McElroy argue or exchange angry words. Ms. Graves testified a lot of tension had developed between defendant and her son, Mr. McElroy, in the few weeks prior to the shooting. Mr. McElroy and Ms. Barajas had moved into the apartment occupied by defendant and Ms. Pacheco. One week later, Ms. Pacheco had moved out. Ms. Graves testified Ms. Pacheco "didn't seem comfortable" with "the whole" situation.

6

## III.  DISCUSSION

### A.  Defendant's Motion to Suppress His Statements

#### 1.  Defendant's contentions

Sheriff's Detectives Dan McElderry and Robert Gray interviewed defendant on February 8, 2012, in the immediate aftermath of the shooting, and six days later, on February 14, 2012.  Defendant argues statements he made during those interviews were obtained in violation of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, 444 (*Miranda*).  The trial court denied defendant's motion to suppress.  We conclude the trial court should have suppressed defendant's February 8, 2012 statement.  Also, we conclude the trial court could reasonably deny defendant's motion to suppress his February 14, 2012 statement.  And, we conclude any error was harmless beyond a reasonable doubt.

#### 2.  Standard of review

Our Supreme Court has explained:  "Under *Miranda* and its progeny, 'a suspect [may] not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and, if indigent, to appointed counsel.' (*People v. Cunningham* (2001) 25 Cal.4th 926, 992.)  If at any point in the interview the suspect invokes the right to remain silent or the right to counsel, 'the interrogation must cease.' (*Miranda, supra,* 384 U.S. [at p.] 474; see *id.* at pp. 444-445.)  . . . .  [¶]  In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, and we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally

obtained. (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125.)" (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104-1105; accord, *People v. Duff* (2014) 58 Cal.4th 527, 551.)

### 3. The February 8, 2012 questioning of defendant

Defendant's initial interview occurred in the hours following the shooting in a sheriff's station. Defendant was not under arrest. But defendant's hands were "bagged" pending gunshot residue tests. Detectives McElderry and Gray did not know whether defendant was a suspect. They were aware defendant had blamed others. The detectives questioned defendant in an interview area of the sheriff's station. The interview was audio recorded.

At the outset of the interview, defendant was read his *Miranda* rights. A conversation concerning those rights ensued: "[Detective] Gray: . . . I want you to relax and just we're - - we're gonna talk, you know, and try to figure out exactly what happened over there. All right? Uhm, because you're here, in the station, we're going to advise you of your rights. You're not under arrest but because you're here in the station, talking to us; right? Have you ever been arrested before? [¶] [Defendant]: (INAUDIBLE.) [¶] [Detective] Gray: What for? [¶] [Defendant]: Bullshit, small shit. [¶] [Detective] Gray: Okay. Can you read? [¶] [Defendant]: Little bit. [¶] [Detective] Gray: Come up closer over here 'cause I want to go over this with you. I'm going to ask you these questions, and at the end of the question I'm going to ask you do you understand. If you understand, let me know yes. I'm going to give you my pen. If you could do me a favor, if you don't mind, if you understand, put a 'Y' after each question; okay? Here's the pen. Okay, you have the right to remain silent. Do you understand? Is that a yes or no. [¶] [Defendant]: Yes. [¶] [Detective] Gray: Anything you say may be used against you in a court. Do you understand? [¶] [Defendant]: Yes. [¶] [Detective] Gray: You have the right to an attorney during questioning. Do you understand? [¶] [Defendant]: (INAUDIBLE.) [¶] [Detective] Gray: If you cannot afford an attorney, one will be appointed for you before any questioning. Do you understand? [¶]

8

[Defendant] (INAUDIBLE.) [¶] [Detective] Gray: Do me a favor, if you don't mind, sign it and date it and today's the – February 8th. Just on the bottom here is cool. [Writing sounds can be heard on the audio tape.] [¶] [Defendant]: What is this? If you desire an express waiver ask a yes or no question such as, 'do you want to talk about what happened?' [¶] [Detective] Gray: Yeah. [¶] [Defendant]: What does that mean? [¶] [Detective] Gray: Meaning we ask you 'do you want to talk about what happened?' [¶] [Defendant]: Then I can tell you no, then I can go? [¶] [Detective] Gray: No. [¶] [Detective] McElderry: Do you want to explain to us what happened? [¶] [Defendant]: No. I'm just trying to understand that part. [¶] [Detective] Gray: No. It says – it's not a trick or anything. That's not a trick. That's why I let you go and read the whole thing. We're not trying to pull the wool over your eyes. It's just yes or no, do you want to talk about it? [¶] [Defendant]: My buddy just, I mean, you told me he died. *I don't want to be here and I don't want to talk with you guys.* [¶] [Detective] Gray: Well, I know but -- but -- [¶] [Defendant]: *I don't want to talk to nobody.* [¶] [Detective] Gray: That's your buddy though; right? [¶] [Defendant]: Yeah, that's my buddy. [¶] [Detective] Gray: Okay. Good friend of yours? [¶] [Defendant]: Yeah. [¶] [Detective] Gray: How long you known him for? [¶] [Defendant]: Years, years. [¶] [Detective] Gray: Well, when you say years, two years, three years, --" (Italics added.) At this point, a discussion ensued about matters other than the shooting itself including defendant's relationship with the victim and the victim's family.

Defendant subsequently told the detectives the shooting was accidental: "[Detective] Gray: Okay. . . . So, what happened today? [¶] [Defendant]: We were drinking. Now, we decided to clean our guns. I got a 410 and for some reason when we got done cleaning it we tried to load it and see what would happen. It wasn't clicking down. It wasn't breaking together. So, he told me to hold the butt and he would snap it up, you know, and when it snapped together it went off." Defendant admitted, "I know I'm in trouble" and "I just fucking shot my friend in the face, dude." Defendant said he had initially lied about how the shooting occurred because he was "freaking out." When pressed for details, defendant repeated that, "For some stupid, idiotic reason we decided

to start cleaning our guns and stuff like that." Defendant described the events leading to the shooting. The transcript of the interview states: "[Defendant]: . . . After I was cleaning, we put [a] round in and we tried to snap it . . . and for some reason it wouldn't go. And he's - - he's a strong guy, . . . and so, he's like - - he told me to hold the butt and shit and he would (SOUND); you know? Soon as it closes, it went off. Blew his fucking face off; right?" According to defendant, Mr. McElroy was sitting on the couch with both hands on the barrel trying to snap it in when the weapon fired. Defendant admitted throwing the guns off the balcony into the bushes. He denied at first that he had forced the bathroom door open. He said the lock had been a problem in the past. And they had a Chihuahua for a while that chewed on the wood panel. Ultimately defendant admitted, "[A]fter I looked for the towel, I think Carla went and locked herself in and I went and I had tried to go open it but it was locked." At the conclusion of the interview, defendant described the events as, "A tragic accident." He said: "But is there negligence here? I don't know."

At the Evidence Code section 402 hearing in the trial court, Detective McElderry described the circumstances surrounding the *Miranda* warnings. Detective Gray read defendant's *Miranda* rights from a card. Detective Gray sat next to defendant. Defendant followed along as Detective Gray read the admonitions. Defendant wrote a "Y" after each admonition. Defendant signed and dated the card, as did Detective Gray. Defendant then inquired about the instruction to law enforcement officers at the bottom of the card, which read, "If you desire an express waiver, ask a yes or no question such as, do you want to talk about what happened?" Detective McElderry recalled the circumstances as follows: "[Detective] Gray was explaining to [defendant] what that express waiver was. As [defendant] asked the question, 'Does that mean I don't have to talk to you? And I can go home' - - I remember something about him saying something about going home - - I believe that 'no' was 'no, you're not going home'; whether or not he talked to us or not. I mean, we had an investigation to conduct. We had - - his home was locked down, because there were crime scene investigators at his home."

10

In the trial court, defense counsel argued there was a violation of defendant's *Miranda* rights in that defendant said he did not want to talk to the detectives. The trial court disagreed and found as follows. The advisement to law enforcement officers at the bottom of the card was not something a suspect was meant to read. The advisement would be confusing to anyone unfamiliar with the law. When defendant's confusion arose, all three men began to speak at the same time. But, according to the trial court, defendant had already indicated he understood his rights. Defendant's response to the question about whether he wanted to talk about "it" did not invoke his right to remain silent in the trial court's view. Instead, defendant was clearly upset that Mr. McElroy had died. And defendant did not want to talk about it with *anyone.* But then he voluntarily talked to the detectives. Thus, the trial court ruled no violation of defendant's right to silence had occurred. On appeal, defendant argues: "[T]he record does not show that [defendant] was advised of, and understood his rights, let alone waived them. While a waiver under some circumstances may be inferred from the defendant's conduct [citation], [s]uch authorities do not apply here because they presuppose that the defendant was aware of and understood his rights in the first instance. For this reason alone, the February 8 statement should have been suppressed. [¶] Additionally, the statement should have been suppressed because [defendant] unequivocally stated that he did not want to talk to the detectives."

4. Defendant expressly asserted his right to silence during the February 8, 2012 questioning

We conclude defendant unambiguously and unequivocally asserted his right to remain silent. Following *Miranda* warnings and waiver, police interrogations must cease when an interviewee invokes his or her right to counsel or to remain silent. (*Michigan v. Mosley* (1975) 423 U.S. 96, 100-101; *Miranda, supra,* 384 U.S. at pp. 473-474; *People v. Cunningham* (2015) 61 Cal.4th 609, 645; *People v. Suff* (2014) 58 Cal.4th 1013, 1068.) But the interviewee's invocation of the right to remain silent must be unambiguous and

11

unequivocal. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381-382; *People v. Suff, supra,* 58 Cal.4th at p. 1068; *People v. Scott* (2011) 52 Cal.4th 452, 481.) The test is objective–would a reasonable officer in light of the circumstances understand the statement to be a request to cease the interview. (*Davis v. United States* (1994) 512 U.S. 452, 459 [right to counsel]; *People v. Cunningham, supra,* 61 Cal.4th at p. 646; *People v. Nelson* (2012) 53 Cal.4th 367, 371-372, 376.) As the United States Supreme Court explained in *Davis,* "[I]f a suspect makes a [statement] that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right [to remain silent], our precedents do not require the cessation of questioning." (*Davis v. United States, supra,* 512 U.S. at p. 459; accord, *People v. Williams* (2010) 49 Cal.4th 405, 432.) Stated differently, our Supreme Court has explained: "'It is not enough for a reasonable police officer to understand that the suspect *might* be invoking his rights. [Citation.] Faced with an ambiguous or equivocal statement, law enforcement officers are not required under *Miranda* . . . to ask clarifying questions or to cease questioning altogether.' (*People v. Stitely* (2005) 35 Cal.4th 514, 535; see *Davis v. United States*[*, supra,*] 512 U.S. [at p.] 452.)" (*People v. Suff, supra,* 58 Cal.4th at p. 1068.) Moreover, as our Supreme Court stated in *Williams,* "In certain situations, words that would be plain if taken literally actually may be equivocal under an objective standard, in the sense that *in context* it would not be clear to the reasonable listener what the defendant intends." (*People v. Williams, supra,* 49 Cal.4th at p. 429; see *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 218.) Moreover, in *Williams*, our Supreme Court further explained, "'A defendant has not invoked his or her right to silence when the defendant's statements were merely expressions of passing frustration or animosity toward the officers, or amounted only to a refusal to discuss a particular subject covered by the questioning.' [Citations.]" (*People v. Williams, supra,* 49 Cal.4th. at pp. 433-434 ["I don't want to talk about it" was an expression of the defendant's frustration]; accord, e.g., *People v. Stitely, supra,* 35 Cal.4th at p. 535 ["I think it's about time for me to stop talking" expressed apparent frustration only].)

12

The Attorney General relies upon the analysis in *Williams*, *Stitley* and *Suff* and asserts that in the context of the interaction on February 8, 2012, defendant did not unequivocally assert the right to silence. The Attorney General argues the trial court's characterization of the conversation between defendant and the detectives is supported by the recorded interview. Defendant was upset about the death of Mr. McElroy, a friend. He expressed reluctance to talk about the evening's events. Defendant did not want to talk about it *with anyone*. In these circumstances, a reasonable investigator could understand defendant's statement, "I don't want to talk with you guys," to merely mean I do not want to discuss the shooting. According to the Attorney General, a reasonable investigator could have understood defendant's statement to mean I am willing to tell you, the detectives, what happened. Following defendant's statement, Detective Gray asked defendant at length about matters not directly related to the shooting itself. This included: defendant's relationship with Mr. McElroy; defendant's relationship with the victim's family; and where defendant grew up. The conversation proceeded without interruption. Defendant answered each question without hesitation. It was several minutes before Detective Gray asked any questions about the shooting. Defendant continued to answer the detectives' questions. Defendant voluntarily explained what happened. Thus, the Attorney General argues that context demonstrates there was no violation of defendant's *Miranda* rights. We are unpersuaded.

The United States Supreme Court has described the nature of an unequivocal assertion of the right to silence which requires an immediate cessation of questioning: "[The defendant] did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his "'right to cut off questioning.'" *Mosley, supra,* [423 U.S.] at [p.] 103 (quoting *Miranda, supra,* [384 U.S. at [ him p.] 474). Here he did neither, so he did not invoke his right to remain silent." (*Berghuis v. Thompkins, supra,* 560 U.S. at p. 382; see *United States v. Plugh* (2011) 648 F.3d 118, 124-127; *People v. Villasenor* (2015) 242 Cal.App.4th 42, 62-70.) Here, the context is clear, defendant made it clear—he did

not want to talk to the detectives or anybody else.  Thus, his statements at the February 8, 2012 interview were inadmissible.

### 5.  The February 14, 2012 questioning of defendant

Defendant was in custody on an unrelated warrant until February 14, 2012. Detectives McElderry and Gray learned defendant was about to be released from jail. They went to the jail to talk to defendant.  Detectives McElderry and Gray were accompanied by a Detective Sylvia Brossoiet.  All three detectives were armed.  The detectives waited for defendant in the public lobby into which inmates were released.

When defendant entered the public lobby, the following ensued:  "[Detective] Gray:  Hey Brian, how you doing?  [¶]  [Defendant]:  My people been trying to reach you guys forever.  [¶]  [Detective] Gray:  What happened?  [¶]  [Defendant]:  My family and them, trying to talk to you guys to see what's going on.  [¶]  [Detective] McElderry:  I know your dad's been calling.  [¶]  [Defendant]:  Yeah.  My sisters and my wife, my dad. [¶]  [Detective] McElderry:  I know.  We were out the last couple days so they were calling like crazy the last couple days.  [¶]  [Defendant]:  So what's going on?  [¶] [Detective] Gray:  Well, we just want to rap with you real quick, too.  I know you just got released but can we rap with you real quick?  [¶]  [Defendant]:  Yeah.  [¶]  [Detective] Gray:  Okay, let's go in here.  [¶]  [Defendant]:  Thank you, sir."  Detective Gray escorted defendant to an unlocked room off the lobby.  It was a deoxyribonucleic acid sample collection room where out-of-custody individuals could submit samples.  The room was in the public area of the jail facility.  The detectives left the door open. Defendant sat in a chair next to Detective Gray.  Defendant was closest to the door. Defendant was not handcuffed or otherwise restrained.

Defendant talked about what he had been hearing from others with respect to the shooting.  Detective Gray then told defendant:  "Well, we wanted to talk to you . . . just one more time . . . just to be thorough.  [¶]  . . .  [¶] . . . And to get this - - this thing about how this whole thing happened again."  Defendant was advised no charges had been filed

14

against him as a result of the shooting.  At the detectives' request, defendant described at length the events leading to Mr. McElroy's death.  Defendant explained that during a recent hunting outing, the gun had been "giving us a little bit of" problems.  As a result, defendant decided to clean the weapon.  Defendant then loaded the gun and attempted to snap it shut, but it was not working.  Mr. McElroy offered to help.  Defendant described how he was standing and holding the gun.  Defendant described what Mr. McElroy, who was sitting, was doing.  Detective Gray asked, "So, you don't remember your finger on the trigger . . . ?"  Defendant answered, "Yeah, but I – I'm pretty sure it was on it."  Defendant reiterated that he had lied about the "two black guys" because he "freaked out."  He admitted encountering Carla in the bathroom and saying, "Hey, two black guys did this."

The detectives asked defendant to describe how close the end of the barrel was to Mr. McElroy's face when the gun discharged.  Detective Gray told defendant, "[T]his is important."  Eventually, defendant said it was "pretty close," maybe five to six inches away.  The detectives then confronted defendant with the autopsy findings.  Detective Gray said, "[B]y all accounts, according to the coroner, the barrel is inside his mouth when it goes off."  Defendant responded:  "Fuck no.  What the fuck?"  Defendant repeatedly and vehemently denied that the gun had been in Mr. McElroy's mouth when it discharged.  Defendant told the detectives:  "I would have never fucking put the barrel in his mouth and fucking took that guy's life like that, dude.  Never."  Detective Gray subsequently asked, "Why were you loading the gun?"  Defendant responded:  "I don't know.  Just to keep it loaded right there by my bed, I guess, like I said; you know?  I don't know.  Like there's no legitimate reason.  . . .  It was just, I guess, to have it loaded, like I said, and to have it right there by my bed."  Defendant talked at length about the events of the day preceding the shooting.  The discussion returned to the manner in which the shooting occurred.  Defendant ultimately conceded that the gun might have been in Mr. McElroy's mouth when it fired.  But defendant denied any memory of it.  The transcript of the interview states:  "[M]aybe after we clicked, if there was movement or something, you know, maybe, like I said, you know, maybe the eyesight had poked him

15

and it went off.  You know?  [¶] . . . [¶] . . . Maybe that could of happened but from what I remember, I don't remember it being in his mouth. . . . [T]hen again, . . . maybe I just started freaking . . . Because it happened (SNAPS FINGERS) so fucking fast."  At the end of the interview, defendant was arrested.

In the trial court, defense counsel argued the interview was custodial and *Miranda* warnings should have been given in that:  the interview took place in a custodial facility; defendant was taken to a separate room, away from the public; the door was only partially open; there were three armed detectives in the room with defendant; and, at the conclusion of the interview, defendant was arrested.  The trial court found the setting was not custodial.  We agree.

*Miranda* procedures only apply in custodial settings.  (*Miranda, supra,* 384 U.S. at p. 444; *People v. Tom* (2014) 59 Cal.4th 1210, 1244; *People v. Storm* (2002) 28 Cal.4th 1007, 1037.)  And, as our Supreme Court recently reiterated, "For *Miranda* purposes, custodial status arises if a person has been 'taken into custody or otherwise deprived of his freedom of action in any significant way.'  [*Miranda, supra,* 384 U.S. at p. 444].)"  (*People v. Elizalde* (2015) 61 Cal.4th 523, 531, fn. omitted; accord, *People v. Storm, supra,* 28 Cal.4th at p. 1037.)  Our colleagues in Division Two summarized the applicable law in the case of *In re Kenneth S.* (2005) 133 Cal.App.4th 54, 64, as follows: "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a '"formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'  (*California v. Beheler* (1983) 463 U.S. 1121, 1125 [(*per curiam*)], quoting *Oregon v. Mathiason* (1977) 429 U.S. 492, 495 . . . .)  The deprivation can be constructive as well as actual.  '[C]ustody occurs if the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived.'  (*People v. Arnold* (1967) 66 Cal.2d 438, 448, disapproved on other grounds in *Walker v. Superior Court* (1988) 47 Cal.3d 112, 123.)  [¶]  The objective circumstances of the interrogation, not the subjective intention of the interrogating officer or the subjective understanding of the person being questioned, is evaluated in

determining whether the person was in custody at the time of the questioning. 'A policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time'; rather, 'the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.' (*Berkemer v. McCarty* (1984) 468 U.S. 420, 442.) The United State [*sic*] Supreme Court has made clear, in no uncertain terms, that any inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned (assuming those suspicions remain undisclosed) is not relevant for purposes of *Miranda.* (*Stansbury v. California* (1994) 511 U.S. 318, 320.) An officer's knowledge or beliefs may bear upon the custody issue only if they are conveyed, by word or deed, to the individual being questioned. (Cf. *Michigan v. Chesternut* (1988) 486 U.S. 567, 575, fn. 7, citing *United States v. Mendenhall* (1980) 446 U.S. 544, 554, fn. 6 (Opn. of Stewart, J.).) But '[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue. . . .' (*Stansbury v. California, supra,* [511 U.S.] at p. 325.)" (Accord, *People v. Macklem* (2007) 149 Cal.App.4th 674, 689-690.) Even when detectives interject accusatory or skeptical questions, absent other evidence of restraint on a person's freedom of movement, the nature of the questioning does not convert voluntary presence into custody. (*People v. Moore* (2011) 51 Cal.4th 386, 402-403.) As the United States Supreme Court has summarized: "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." (*Thompson v. Keohane* (1995) 516 U.S. 99, 112, fn. omitted; accord, *People v. Cromer* (2001) 24 Cal.4th 889, 895; *In re Joseph H.* (2015) 237 Cal.App.4th 517, 530-531.)

Here, defendant was greeted after he was released from custody on an unrelated warrant into the public lobby of a jail. Defendant agreed to speak with the three detectives. In fact, he was eager to talk to the detectives and thanked them for the opportunity to do so. The interview took place in a room off of the lobby, in a public area of the jail facility. The door to the room was partially open. Defendant sat closest to

17

the door.  Defendant was not handcuffed or otherwise restrained.  Detective McElderry told defendant no charges had been filed as a result of the shooting.  The detectives eventually exhibited skepticism as to defendant's claim the gun was not in Mr. McElroy's mouth.  Their questioning then took on an accusatory edge.  However, there was no other change in the manner of questioning.  Under these circumstances, a reasonable person would have believed that she or he was not under arrest and was at liberty to leave.  Because defendant was not in custody, the prophylactic *Miranda* rule is inapplicable to the February 14, 2012 interview.  And the prior questioning after defendant said he did not want to speak to the detectives does not affect the admissibility of his noncustodial statements on February 14, 2012.  (*Oregon v. Elstad* (1985) 470 U.S. 298, 308-309; *Michigan v. Tucker* (1974) 417 U.S. 433, 446-448; *People v. Davis* (2009) 46 Cal.4th 539, 598-599; *People v. Lujan* (2001) 92 Cal.App.4th 1389, 1409; see *Dickerson v. United States* (2000) 530 U.S. 428, 441.)

6. Prejudice

We conclude any error in admitting defendant's February 8, 2012 in custody statements to the detectives is harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S.18, 22; *People v. Jablonski* (2006) 37 Cal.4th 774, 816-817.)  Defendant made essentially the same statements on February 14, 2012 after he was released from county jail custody.  During both interviews, defendant said the shooting was an accident.  The shooting occurred when Mr. McElroy and defendant were trying to snap the loaded weapon closed.  Standing alone, the February 14, 2012 post-release statement is sufficient to mitigate any prejudice.  Further, the prosecution evidence concerning defendant's involvement in the shooting of Mr. McElroy was overwhelming.

Even if both the February 8 and 14, 2012 statements were inadmissible, the alleged error would still be harmless.  The prosecution testimony, apart from the evidence provided by defendant's two challenged statements, was almost solely consistent with a malicious premeditated homicide.  By contrast, defendant's February 8 and 14, 2012

18

statements were more consistent with the manslaughter verdict then any of the other prosecution evidence.  The recorded February 8, 2012 statement contains moving evidence of defendant's remorse over Mr. McElroy's death.  And, defendant's February 14, 2012 statement was also entirely consistent with the manslaughter verdict that was returned.  Stated differently, unlike the typical case involving inadmissible confessions, here the strongest evidence limiting defendant's culpability were his own statements to the authorities.  Any error in connection with either defendant's February 8 and 14, 2012 statements was harmless beyond a reasonable doubt.  It was purported error that strongly militated to defendant's benefit by mitigating his culpability.

## B.  Other Evidentiary Issues

### 1.  Standards of review

A trial court has broad discretion in ruling on the admissibility of evidence—both in terms of its relevance and whether its prejudicial effect outweighs its probative value. (*People v. Jones* (2011) 51 Cal.4th 346, 373; *People v. Horning* (2004) 34 Cal.4th 871, 900.)  We review the trial court's evidentiary rulings for an abuse of discretion.  (*People v. Lucas* (2014) 60 Cal.4th 153, 229 [relevance], disapproved on another point in *People v. Romero* (2015) 62 Cal.4th 1, 53, fn. 19; *People v. Clark* (2011) 52 Cal.4th 856, 893 [Evid. Code, § 352]; *People v. Geier* (2007) 41 Cal.4th 555, 586, overruled on another point by *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 [Evid. Code, § 1250, subd. (a)].)  As our Supreme Court explained in *People v. Williams* (2008) 43 Cal.4th 584, 634-635:  "A trial court's discretionary [evidentiary] ruling[s] . . . '"must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]"'  (*People v. Rodrigues* [(1994)] 8 Cal.4th [1060,] 1124-1125.)"  As we will explain, as a result of the evidentiary rulings, we find:  no abuse of discretion; no improper admission of highly inflammatory and prejudicial evidence rendering

19

defendant's trial fundamentally unfair; and no denial of the right to effective assistance of counsel.

## 2. Out-of-court statements

Defendant challenges several out-of-court statements admitted in support of the prosecution's case. First, the prosecution presented motive evidence to the effect that Mr. McElroy had a romantic relationship with defendant's girlfriend. As noted above, Mr. Alvarez testified to observing romantic conduct between Mr. McElroy and Ms. Pacheco. Further, two weeks prior to the shooting, defendant sent Mr. McElroy a text stating: "You're my best friend, my brother. You stabbed me in my back. How could you do this to me?" Defendant moved to exclude the text message as irrelevant hearsay that was more prejudicial than probative. The trial court concluded the text was a party admission, was circumstantial evidence of motive, and was more probative than prejudicial. On appeal, defendant does not challenge the trial court's party admission finding. Defendant argues there was a complete lack of context to the text message, therefore the jury had no basis on which to evaluate whether it referred to a trivial or a serious matter. We find no abuse of discretion. The text message evidence was properly before the jury as a party statement. (Evid. Code, § 1220; *People v. Smith* (2015) 61 Cal.4th 18, 48.) And it was probative on the issue of motive. It is well established that: "'"[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citations.]' ([*People v.*] *Gonzalez* [(2005)] 126 Cal.App.4th [1539,] 1550.)" (*People v. McKinnon* (2011) 52 Cal.4th 610, 655; accord, *People v. Evans* (2011) 200 Cal.App.4th 735, 749; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168; *People v. Garcia* (2008) 168 Cal.App.4th 261, 275; *People v. Pertsoni* (1985) 172 Cal.App.3d 369, 375; *People v. Lopez* (1969) 1 Cal.App.3d 78, 85.) Here, the trial court could reasonably conclude the probative value of the evidence outweighed any prejudicial effect.

Second, there was evidence defendant was unwilling to fight Mr. McElroy. This was because of Mr. McElroy's size. Instead, defendant threatened to just shoot Mr. McElroy. Defendant challenges the admission of those prior statements. Defendant argues they were improper criminal disposition or propensity evidence. The trial court found the statements were admissible under the state-of-mind exception, Evidence Code section 1250, subdivision (a)(2) states in part: "Subject to Section 1252 [lack of trustworthiness], evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] . . . [¶] . . . The evidence is offered to prove or explain acts or conduct of the declarant." There was no abuse of discretion. The statements were admissible under Evidence Code section 1250, subdivision (a)(2). They were nonhearsay circumstantial evidence the shooting was not nonaccidental. In other words, without abusing its discretion the trial court could rule that defendant acted in conformity with his expressed state of mind. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1138; *People v. Karis* (1988) 46 Cal.3d 612, 634-637; *People v. Spector* (2011) 194 Cal.App.4th 1335, 1392-1397; see *People v. Howard* (1988) 44 Cal.3d 375, 402-403.)

Defendant argues the statements were inadmissible absent evidence he had described circumstances that would motivate such a shooting. And defendant argues the statement was inadmissible in the absence of evidence from which it could be inferred the shooting was in fact motivated by such circumstances. Accepting defendant's argument as relevant, we find the present evidence met that test. Defendant had threatened to shoot Mr. McElroy. This was because Mr. McElroy was bigger than defendant. There was evidence defendant was angry with Mr. McElroy. There was evidence tension had been building between the two men in the weeks preceding the shooting. During the day the shooting occurred, the two men appeared not to be speaking to each other. Ms. Barajas heard them arguing shortly before the shooting. The jury could reasonably infer defendant had reason to fight Mr. McElroy. Instead, consistent with the prior statements, defendant simply shot Mr. McElroy.

21

### 3. Mr. McElroy's fear of defendant

As noted above, evidence Mr. McElroy feared defendant was admitted at trial. Mr. McElroy had expressed concern that there were guns in the apartment they shared and something bad might happen. Further, as noted, there was testimony as to Mr. McElroy's fears, "That he thought that [defendant] was gonna do him dirty." Defendant contends the evidence was "blatantly improper hearsay" and inadmissible propensity evidence. We find no abuse of discretion. The evidence was admissible under Evidence Code section 1250 to refute defendant's claim the shooting was accidental. (*People v. Lew* (1968) 68 Cal.2d 774, 779-780; see *People v. Riccardi* (2012) 54 Cal.4th 758, 816.) As the Attorney General explains, "[This evidence] tended to refute the suggestion . . . that Mr. McElroy trusted [defendant] enough to have asked him to hold the butt of a shotgun that was pointed at Mr. McElroy's head while he 'snapped it up,' and that the shooting was the result of an accidental discharge."

### 4. Dr. Krell's Testimony

As noted above, Dr. Krell testified for the defense concerning firearms and ballistics evidence. Defendant argues the trial court improperly limited questioning concerning Dr. Krell's status as a court appointed witness. Further, defendant argues the trial court improperly prohibited questioning as to the fact if it would fix Dr. Krell's level of compensation.

First, the trial court excluded evidence Dr. Krell was court-appointed. At trial, defendant was represented by Hung Du. On appeal, defendant argues Mr. Du, was precluded from showing Dr. Krell was more than just a "hired gun." Dr. Krell testified he was "on the panel of the proved experts" for Los Angeles County. Mr. Du subsequently asked Dr. Krell, "How did you actually get appointed to this case?" The trial court did not allow Dr. Krell to answer. The trial court ruled Dr. Krell's credibility may not be enhanced implying the superior court had deemed him an "expert" and put

22

the weight of its appointment behind him. Further, the trial court ruled Dr. Krell's credibility could not be bolstered by informing the jury who would be determining the level of his compensation. The trial court ruled: "[T]he implication that you are trying to get is there is no bias because the court is a neutral person, is the one paying him as opposed to the defendant himself. [¶] There's only one reason the court is paying and that's because the defendant is indigent." Mr. Du responded: "I respectfully disagree. I believe that I do have the right to provide the jury and let them make the decision as to whether or not this individual is bias[ed] based on who pays him."

A trial court may appoint a witness to express an opinion for an indigent defendant and fix the compensation for his or her services. (Evid. Code, § 730; *People v. Stuckey* (2009) 175 Cal.App.4th 898, 908.) The compensation so fixed is paid by the county in which the action is pending. (Evid. Code, § 731, subd. (a)(1); *People v. Stuckey, supra,* 175 Cal.App.4th at p. 908.) And, pursuant to Evidence Code section 722, subdivision (b), "The compensation and expenses paid or to be paid to an expert witness by the party calling him is a proper subject of inquiry by any adverse party as relevant to the credibility of the witness and the weight of his testimony." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1071, disapproved on another point in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1; *People v. Price* (1991) 1 Cal.4th 324, 457.)

Here, however, the defense sought to enhance Dr. Krell's credibility by introducing evidence as to who set the amount of his compensation. We find no error in the trial court's ruling. Evidence Code section 722, subdivision (b) does not authorize inquiry as to the source of a court appointed opinion witness's compensation under these circumstances. Moreover, the trial court could reasonably rule Dr. Krell's testimony was not subject to special credence because his compensation was fixed by the court. The same is true in terms of the fact Dr. Krell would be compensated by Los Angeles County rather than by the defendant. (See *People v. Coddington* (2000) 23 Cal.4th 529, 615-616, disapproved on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; *People v. Stansbury* (1993) 4 Cal.4th 1017, 1059.)

The trial court also relied on Evidence Code section 352, stating: "[I]f I were to allow that, what would happen is on cross-examination the People could then get into the whole panel and how it works and how the defendant must be indigent in order for the court to write a check, taxpayers to pay their money, and under [Evidence Code section] 352, not only do I think that that will hurt your client but it is certainly not relevant. [¶] It's going to be an undue consumption of time. It would be necessary to correct the implication that is improper for you to bring up in the first place." Defendant has not challenged this ruling. And, in any event, we would not find any abuse of discretion.

Second, defendant further asserts the trial court improperly limited inquiry into Dr. Krell's background as a firearms and ballistics instructor. Dr. Krell testified in part that: he was "a firearms instructor"; he had "about 16 or 17 years as a firearm instructor"; he had also been, for 2 years, a part-time civilian instructor for the Marine sniper school; and he offered training in his current occupation "in using a handgun, using a carbine, . . . us[ing] a precision rifle and using a shotgun." The trial court sustained a relevance objection, however, as to further evidence Dr. Krell had instructed others. The trial court reasoned instructing others was not a basis for Dr. Krell's expertise. The trial court explained: "The content of his classes is not relevant. That was where you were going." There was no abuse of discretion. The trial court could reasonably conclude evidence as to the classes Dr. Krell taught was not sufficiently probative to warrant extensive testimony.

Finally, defendant asserts violations of various constitutional rights in blanket terms. The trial court's rulings did not deprive defendant of a defense, nor did it violate any of defendant's constitutional rights. (*People v. Lucas, supra,* 60 Cal.4th at pp. 270-271; *People v. Ramos* (1997) 15 Cal.4th 1133, 1175.) As our Supreme Court has repeatedly observed, "Th[e] routine application of state evidentiary law does not implicate [a] defendant's constitutional rights." (*People v. Brown* (2003) 31 Cal.4th 518, 545, fn. omitted; accord, *People v. Jones* (2013) 57 Cal.4th 899, 957; *People v. Riccardi, supra,* 54 Cal.4th at pp. 809-810; *People v. Castaneda* (2011) 51 Cal.4th 1292, 1341; *People v. Taylor* (2010) 48 Cal.4th 574, 650; *People v. Mills* (2010) 48 Cal.4th 158, 194;

24

*People v. Lewis* (2009) 46 Cal.4th 1255, 1289; *People v. Hovarter* (2008) 44 Cal.4th 983, 1010.) Moreover, our Supreme Court has described the circumstances when constitutional claims are not properly preserved, "As defendant provides no elaboration or separate argument for [his] constitutional claims, we decline to address further these boilerplate contentions." (*People v. Hovarter, supra,* 44 Cal.4th at p. 1010; accord, *People v. Mills, supra,* 48 Cal.4th at p. 194; *People v. Brown, supra,* 31 Cal.4th at p. 537-538, fn. 6; *People v. Hardy* (1992) 2 Cal.4th 86, 150.) The same is true here. Defendant has failed to demonstrate any of his constitutional claims have merit.

## C.  CALJIC No. 8.45

Mr. Du requested an involuntary manslaughter instruction to the effect that: "A killing is unlawful within the meaning of this instruction if it occurred: [¶] 1. During the commission of an unlawful act [not amounting to a felony] which is dangerous to human life under the circumstances of its commission . . . ." (CALJIC No. 8.45.) Mr. Du argued marijuana possession was the unlawful act. Mr. Du explained: "[W]hen you take the totality of the facts, between the using of the gun while under the influence, with the possession of the marijuana, that would rise to the level of an unlawful act within the meaning of the jury instruction." The trial court denied the request, finding neither being under the influence of, nor possession of marijuana was dangerous to human life under the circumstances of its commission. The trial court did instruct the jury on voluntary intoxication as it affects specific intent or mental state pursuant to CALJIC No. 4.21. Our review is de novo. (*People v. Souza* (2012) 54 Cal.4th 90, 113; *People v. Booker* (2011) 51 Cal.4th 141, 181.) We find no error. An involuntary manslaughter conviction may be based on the commission of a misdemeanor that is dangerous under the factual circumstances of its commission. (See *People v. Cox* (2000) 23 Cal.4th 665, 670-676; *People v. Wells* (1996) 12 Cal.4th 979, 984-988.) Defendant's unlawful possession or use of marijuana was not dangerous to human life under the circumstances of this case within the meaning of CALJIC No. 8.45.

## D. Sentencing

For the first time on appeal, defendant challenges the trial court's reliance on his sophisticated planning to impose the upper term. First, defendant argues the trial court relied on "nonexistent 'facts'" to impose the upper term insofar as the court found: "[G]iven the story the defendant told and the way in which the weapons were discarded and the scene was set up, it leads the court to believe that this wasn't just something that he thought of after the gun went off. It's a clear indication of a sophisticated plan in this case." Defendant reasons the jury found him guilty of voluntary manslaughter, "which denotes a finding of a sudden quarrel or hea[t] of passion." In a related vein, he reasons the jury therefore rejected the proposition that there was planning. Second, defendant contends the trial court's reference to planning reflects "an institutional bias" in favor of an assumption that he was in fact guilty of murder. Defendant forfeited these claims by failing to raise them at sentencing. (*People v. Boyce* (2014) 59 Cal.4th 672, 730-731; *People v. Scott* (1994) 9 Cal.4th 331, 353.)

Even if the issue were properly before us, and assuming for the sake of argument there was error, we would find no prejudice. The trial court relied on seven aggravating factors in imposing the upper term: "1. The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness. [¶] 2. The manner in which the crime was carried out indicates planning, sophistication, or professionalism. [¶] 3. The defendant took advantage of a position of trust or confidence to commit the offense. [¶] 4. The defendant has engaged in violent conduct that indicates a serious danger to society. [¶] 5. The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness. [¶] 6. The defendant was on probation or parole when the crime was committed; and [¶] 7. The defendant's prior performance on probation or parole was unsatisfactory." (Defendant did not object to the trial court's consideration of any of these aggravating circumstances.) In addition, the trial court noted defendant did not take responsibility for

26

his actions. Instead, defendant blamed the shooting on nonexistent individuals causing limited law enforcement resources to be diverted, putting innocent persons in the area at risk and delaying Mr. McElroy's treatment. Our Supreme Court has held, "When a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen a lesser sentence had it known that some of its reasons were improper. (*People v. Avalos* (1984) 37 Cal.3d 216, 233.)" (*People v. Price, supra,* 1 Cal.4th at p. 492; accord, *People v. Calhoun* (2007) 40 Cal.4th 398, 410 [conc. opn. of Kennard, J.]; *People v. Davis* (1995) 10 Cal.4th 463, 552.) Moreover, only one aggravating factor is required to impose an upper term. (*People v. Black* (2007) 41 Cal.4th 799, 813; *People v. Osband* (1996) 13 Cal.4th 622, 728.) Here, the trial court cited multiple aggravating circumstances supporting the upper term. (*People v. Avalos, supra,* 37 Cal.3d at p. 233; *People v. Gutierrez* (1992) 10 Cal.App.4th 1729, 1735-1736; *People v. Coulter* (1983) 145 Cal.App.3d 489, 494.) It is not reasonably probable the trial court would have imposed the mid or low term had defendant raised the present objections. And, absent a reasonable probability of a different result, defendant's ineffective assistance of counsel claim also fails. (*Strickland v. Washington* (1984) 466 U.S. 668, 697; *People v. Carrasco* (2014) 59 Cal.4th 924, 982; *In re Champion* (2014) 58 Cal.4th 965, 1007-1008.)


E. Abstract of Judgment


The parties agree that the abstract of judgment must be amended to reflect that defendant was convicted of voluntary manslaughter, not murder. (*People v. Jones* (2012) 54 Cal.4th 1, 89; *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

27

# IV.  DISPOSITION

The judgment is affirmed.  Upon remittitur issuance, the clerk of the superior court shall prepare a corrected abstract of judgment reflecting defendant's conviction of voluntary manslaughter rather than murder.  And then, the superior court clerk is to deliver a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P.J.

We concur:

KRIEGLER, J.

KUMAR, J*

---

*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.